PENN TOWNE BUILDERS,
INC., Plaintiff,

and

Superintendent of Insurance of the State
of New York, Intervenor,

v.

The UNITED STATES, Defendant.

No. 580–80 C.

United States Claims Court.

March 6, 1984.

Marvin I. Block, Philadelphia, Pa., for plaintiff; Jerry L. Cohen, Philadelphia, Pa., of counsel.

Daniel J. Conway, Washington, D.C., for intervenor; Charles W. Havens, III, Washington, D.C., and Janet B. Cammack, Houston, Tex., of counsel.

Thomas W.P. Porter, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

SETO, Judge:

This action comes before the court on defendant's motion for summary judgment. Plaintiff, Penn Towne Builders, Inc., ("Penn Towne"), a corporation engaged in general contracting work in New Jersey, seeks a judgment against the United States for $70,000 plus interest as payment for construction work assertedly performed on a housing project financed pursuant to § 236 of the National Housing Act, 12 U.S.C. § 1715z–1. Plaintiff avers that because its contract with the project owner, Union American M.E. Apartments, Inc., ("Union American") was guaranteed by the Secretary of Housing and Urban Development ("HUD"), there exists a contract implied in fact between plaintiff and the United States. Alternatively, plaintiff contends that recovery is proper under unjust enrichment and third-party beneficiary theories.

Defendant, on the other hand, asserts that no implied-in-fact contract existed with Penn Towne because the Government was not a party to the construction contract. Defendant contends moreover that governmental oversight alone, no matter how pervasive, cannot obviate sovereign immunity. Finally, defendant maintains that recovery under purely equitable doctrines is beyond the jurisdiction of this court.

After carefully considering the briefs of the parties and the relevant administrative record, this court grants defendant's motion for summary judgment, and dismisses plaintiff's complaint.

## FACTS

On May 11, 1972, plaintiff, Penn Towne, a general contractor, entered into a cost-plus-fixed-fee construction contract with Union American to perform certain construction work on the Harmony House Apartments project in Camden, New Jersey.[1] The project was being constructed under the provisions of § 236 of the National Housing Act of 1968.[2] In accordance therewith, Penn Towne executed a performance bond with Summit Insurance Company of New York ("Summit") to ensure its contractual performance. Summit, as required, obtained a "Certificate of Authority" from the United States Department of Treasury in order to qualify as an acceptable surety. A "Building Loan Agreement" and a "Regulatory Agreement for Nonprofit Mortgagors" were executed contemporaneously with the construction contract.[3]

1. U.S. Department of Housing and Urban Development Project No. 035–44039–NP.

2. The provisions relevant to the determination of the instant case under § 236 of the Act (12 U.S.C. § 1715z–1) were originally added by Title II, § 201(a) of the Housing and Urban Development Act of 1968, Pub.L. No. 90–448, 82 Stat. 479 (1968). This section was added to allow low income families greater access to rental housing by encouraging private enterprise to develop low-cost housing by providing federal mortgage insurance and interest reduction payments to project owners so that rental

rates to tenants would be reduced. *See* *Abrams v. Hills,* 547 F.2d 1062 (9th Cir.1976). Because Congress had conditioned assistance under the Act upon a number of requirements, HUD's control and supervision of this social program providing opportunity for low-cost housing were essential in order to comply with the statutory framework developed by Congress. *See* 12 U.S.C. § 1715z–1(j)(5).

3. All of the documents executed at the initial closing were Federal Housing Administration (FHA) forms.

The construction contract signed on May 11 by Penn Towne and Union American, the general contractor and the project owner, respectively, called for a construction period of approximately eight months, commencing June 22, 1972, with completion by February 18, 1973. Payments were to be made on a cost-plus-fixed-fee basis, not to exceed $910,000; this, however, was later modified by an "incentive payment" rider that established a bonus for early completion. The building loan agreement, also entered into on May 11, 1972, was executed by the project owner, Union American, and Associated-East Mortgage Company ("Associated-East"). The agreement defined the terms and conditions governing the advance and issuance of financing during construction which the mortgage company would provide to Union American, the project owner.[4] The financing was secured by a mortgage on the project. The Regulatory Agreement for nonprofit mortgagors regulated the owner's use of the loan funds, prospective rental rates, and other obligations and limitations upon the project. In return for these restrictions, the Federal Housing Commission was obligated to completely insure the mortgage note, or to consent to the assignment of the mortgaged property. Through this arrangement, Union American was able to charge lower rental fees than if financing were procured at prevailing market rates because mortgage payments were subsidized in part by HUD. Plaintiff was not a signatory to either the building loan agreement or the regulatory agreement.

Payments to Penn Towne for work completed were explicitly covered in the construction contract with Union American. As work was completed, disbursements of construction funds were to be made pursuant to both the building loan agreement[5] and the construction contract[6] at monthly intervals until the project had been certified substantially complete by the FHA Chief Underwriter. Any amounts due at completion, as well as any amounts in "holdback," would be paid once the construction was certified as complete. Therefore, the construction contract, the Building Loan Agreement, and the Regulatory Agreement constituted the contractual framework within which the parties operated.

Although the parties are not in agreement as to the nature of the delay, it is clear that the project had *not* been completed on schedule by February 18, 1973. As Penn Towne's work progressed, albeit behind schedule, Summit, Penn Towne's surety on the performance bond, solicited status information from HUD on April 4, 1973, regarding why the Harmony House project was two months behind schedule. HUD advised Summit a week later that the project was only seventy-two percent complete, but good progress was being made and no known liens had been filed. Despite HUD's optimism, the project eventually stalled. Recognizing a growing problem,

---

**4.** The agreement provided, in pertinent part:

"4(a). The borrower shall make monthly applications on FHA Form No. 2403 for advances of mortgage proceeds from the Lender. Applications for advances with respect to construction items shall be for amounts equal to (i) the total value of classes of the work acceptably completed; plus (ii) the value of the materials and equipment not incorporated in the work, but delivered to and suitably stored at the site; less (iii) 10 percent (holdback) and less prior advances.... Each application shall be filed at least five days before the date the advance is desired, and the Borrower shall be entitled thereon only to such amount as may be approved by the Lender and the Commissioner.

 * * * * * *

"(6). The Borrower shall cause either this instrument of the construction contract under which the improvements are to be erected to be filed in the public records, if the effect thereof will be to relieve the mortgaged property from mechanics' and materialmen's liens. Before any advance hereunder, the Lender may require the Borrower to obtain from the contractor and all subcontractors and materialmen dealing directly with the principal contractor acknowledgements of payment and releases of lien down to the date covered by the last advance ... and shall cover all work done, labor performed and materials ... furnished for the project."

**5.** Building Loan Agreement, ¶ 4.

**6.** Construction Contract, article 3(B).

the mortgage company elected to assign its mortgage to HUD on October 9, 1973. The assignment became effective on November 19, 1973.[7]

On March 13, 1974, more than a year after the project was to have been completed, HUD, as the assignee of the mortgage and pursuant to its authority under the Building Loan Agreement, advised the bonding company Summit of its intention to terminate the construction contract between Union American and Penn Towne, and that the Government would look to Summit for completion of the project. Finally, on April 19, 1974, approximately fourteen months after Penn Towne was obligated to complete the project, HUD terminated the contract between Union American and Penn Towne in accordance with paragraph nine of the Building Loan Agreement. On the same day, Union American entered into a construction contract with System Construction, Inc., to complete the project at a cost of $145,000. Plaintiff subsequently initiated this suit to recover sums allegedly earned prior to the April 19, 1974, termination. The Superintendent of Insurance of the State of New York, as the duly-named liquidator of Summit, has intervened, claiming entitlement to any sums awarded herein to plaintiff.

## DISCUSSION

Defendant's motion for summary judgment sets forth four reasons why Penn Towne is not entitled to recover: (1) absence of a waiver of sovereign immunity under the above circumstances; (2) absence of any contract or circumstances under which plaintiff could claim status as a third-party beneficiary; (3) lack of privity between the Government and plaintiff; and (4) absence of an implied-in-fact contract between the Government and plaintiff. In response, plaintiff asserts that it is entitled to recover: (1) under federal common law

principles; (2) because the Government has been unjustly enriched by receiving construction services for which it has not paid; (3) because plaintiff is a third-party beneficiary of the various agreements and contracts entered into by the other parties; or (4) that there did indeed exist an implied-in-fact contract between plaintiff and the Government. We deal with plaintiff's theories *seriatim* in order to discern whether, viewed in the light most favorable to plaintiff as the non-moving party,[8] any of plaintiff's theories provide a basis on which relief may be granted.

■ Plaintiff first contends that its suit is not only based on a contractual claim, but also arises under the laws of the United States requiring the application of federal common law. *See Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). This contention is apparently made in an effort to rebut defendant's contention that the Government did not waive its sovereign immunity in this type of situation. Plaintiff cites, and relies solely upon, the opinion in *Trans-Bay Engineers & Builders, Inc. v. Hills,* 551 F.2d 370 (D.C.Cir.1976). *Trans-Bay,* like the instant case, concerned a general contractor's claim against the United States which arose out of work performed under § 236 of the National Housing Act. *Trans-Bay,* however, is inapposite.

In *Trans-Bay,* the court held that the contractor's claim against the United States supported an equitable claim of right arising under § 236 of the National Housing Act of 1968, and thereby established *federal question* jurisdiction under 28 U.S.C. § 1331(a). *Trans-Bay,* 551 F.2d at 378. Plaintiff's reliance on the holding in *Trans-Bay* is misplaced. This court's predecessor unequivocally stated that the holdings of cases like *Trans-Bay* were inapposite to a suit in the Court of Claims:

---

7. There is no indication that this assignment gave HUD any rights greater, or indeed different in kind at all, than those held by Associated-East with regard to the mortgage, *i.e.*, it appears clear that HUD was "stepping into the shoes" of Associated-East, not those of Union American.

8. *See, e.g., Coastal Petroleum Co. v. United States,* 220 Ct.Cl. 690, 693 (1979).

We note that other decisions, for example, *Trans-Bay Eng'rs & Bldrs., Inc. v. Hills,* 551 F.2d 370 (D.C.Cir.1976), and *Traveler's Indem. Co. v. First Nat'l State Bank of N.J.,* 328 F.Supp. 208 (D.N.J. 1971), have assumed or concluded that the Secretary [of HUD] can be compelled to disburse unpaid mortgage proceeds.... The differing result may be explained in part in that none of those cases were concerned with the issue as a jurisdictional matter, *i.e.,* jurisdiction *over the Secretary* was present under statutes other than the Tucker Act [28 U.S.C. § 1491]. Those cases, instead, used the statute and the various agreements to define substantive rights of parties properly before those courts. We, of course, must approach the jurisdictional issue with more constraint and therefore decline to follow the reasoning of those cases. [*Aetna Casualty and Surety Co. v. United States,* 228 Ct.Cl. 146, 158 n. 16, 158 F.2d 1047 (1981)] [Emphasis in original.][9]

The constraint on jurisdiction referred to was succinctly explicated:

> These suits [by the contractor and surety against HUD], of course, are proper only insofar as the United States has waived its sovereign immunity and consented to suit. *See United States v. Mitchell,* 445 U.S. 535, 538 [100 S.Ct. 1349, 1351, 63 L.Ed.2d 607] (1980); *United States v. Testan,* 424 U.S. 392, 399 [96 S.Ct. 948, 953, 47 L.Ed.2d 114] (1976); *United States v. Sherwood,* 312 U.S. 584, 586 [61 S.Ct. 767, 769, 85 L.Ed. 1058] (1941). Waivers of the immunity "cannot be implied, but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4 [89 S.Ct. 1501, 1502, 23 L.Ed.2d 52] (1969); *Soriano v. United States,* 352 U.S. 270, 276 [77 S.Ct. 269, 273, 1 L.Ed.2d 306] (1957). Similarly, any waiver must be strictly construed. *See, e.g., Schillinger v. United States,* 155 U.S. 163, 167–169 [15 S.Ct. 85, 86–87, 39 L.Ed. 108] (1894); *Minnesota v. United States,* 305 U.S. 382,

388–389 [59 S.Ct. 292, 295, 83 L.Ed. 235] (1939). Thus, except as Congress has expressly consented, "there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States." *United States v. Sherwood, supra* at [312 U.S.] 587–588, [61 S.Ct. at 770.]

The Tucker Act, 28 U.S.C. § 1491 (1976) [the relevant portion of which is now codified at 28 U.S.C. § 1491(a)(1)], is the general Congressional consent to suit in this court. Under the Tucker Act, suit in this court is proper only as to actions "founded either upon the Constitution or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Transfer of this case from the district court does not found jurisdiction here, *Berdick v. United States,* 222 Ct.Cl. 94, 99, 612 F.2d 533, 536 (1979), and if these claims are not within one of the categories enumerated by the Tucker Act, the petitions must be dismissed. [*Aetna Casualty,* 228 Ct.Cl. at 150–151, 158 F.2d 1047.]

Plaintiff's assertion in this case of a claim founded on federal common law fails for two reasons: (1) the authority therefor is based on a holding expressly disapproved by this court's predecessor; and (2) the waiver of sovereign immunity applicable to this court does not allow, as one of its enumerated categories, a claim founded upon federal common law. The theory does not afford a basis for this court's exercise of jurisdiction.

 Plaintiff's second contention is based on unjust enrichment. Such a claim, however, is not based upon a contract, but upon equitable doctrines. A claim based upon unjust enrichment is derived from notions of fairness which dictate that "a party *ought* to be bound rather than from the

---

**9.** The decision of the Court of Appeals in *Trans-Bay,* however persuasive it might be in an appropriate case, has no precedential effect on this court's jurisprudence. *Aetna Casualty,* on the other hand, does. General Order No. 1, U.S. Claims Court, October 7, 1982. *See also South Corp. v. United States,* 690 F.2d 1368 (Fed.Cir.1982).

conclusion that a party has *agreed* to be bound." *Aetna Casualty, supra,* 228 Ct.Cl. at 164, 158 F.2d 1047 [emphasis in original]; *See Cleveland.Chair Co. v. United States,* 214 Ct.Cl. 360, 364, 557 F.2d 244 (1977); *Southern States Henry Co-operative, Inc. v. United States,* 4 Cl.Ct. 370 at 373 (Cl.Ct. 1984) [WOOD, J.]. Thus, plaintiff's unjust enrichment theory is essentially derived from a contract implied in law. This court has no jurisdiction over a claim founded on a contract implied in law. *Aetna Casualty,* 228 Ct.Cl. at 164, 158 F.2d 1047; *Cleveland Chair,* 214 Ct.Cl. at 364, 557 F.2d 244; *U.S. Steel Corp. v. United States,* 210 Ct.Cl. 228, 241–246, 536 F.2d 921 (1979).

■ As previously discussed, plaintiff's citation to *Trans-Bay* does not support the proposition that this court has jurisdiction based solely on equitable doctrines. Subject matter jurisdiction in *Trans-Bay* was proper without regard to any contract theory, but was based solely on federal question jurisdiction under 28 U.S.C. § 1331(a). As long as the Tucker Act limits this court's jurisdiction, we have no jurisdiction over claims based solely on equitable considerations. *See, e.g. Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Algonac Manufacturing Co. v. United States,* 192 Ct.Cl. 649, 674, 428 F.2d 1241 (1970).

■ As its third argument, plaintiff asserts that under the terms of the "guarantee" agreement, defendant should have been cognizant that Penn Towne was a third-party beneficiary thereof. Since there was no "guarantee" agreement as such (only a construction contract, Building Loan Agreement, and a Regulatory Agreement), we can only assume that plaintiff cites the Building Loan Agreement as the basis of its claim. The Building Loan Agreement was executed between Union American and Associated-East, the project owner and commercial lender, respectively, and secured by a mortgage note guaranteed by HUD. The "guarantee", however, ran from HUD to the owner and lender respectively, and *not* to the contractor, Penn Towne.

It is now clear that parties such as the plaintiff, which contract with parties other than the federal government, *i.e.,* with a state or private party (such as Union American), and which later sue the United States based on the theory that it was the real party-in-interest, cannot recover against the United States. *D.R. Smalley & Sons, Inc. v. United States,* 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967); *accord Summerville Technical Services v. United States,* 226 Ct.Cl. 291, 640 F.2d 1276 (1981); *Peoples Apparel Ltd. v. United States,* 226 Ct.Cl. 515 (1980); *Housing Corporation of America v. United States,* 199 Ct.Cl. 705, 468 F.2d 922 (1972).

Were plaintiff able to show that it was a *specifically intended* third-party beneficiary of the Building Loan Agreement or the Regulatory Agreement, it might then be able to state a claim of which this court has jurisdiction. *Hebah v. United States,* 192 Ct.Cl. 785, 792, 428 F.2d 1334 (1970). The requirement for such a showing, however, is a strict one:

> No obligation to a third party is created even when the language in the contract provides ... that "funds have been reserved by the government and will be available to effect payment and performance by the Purchaser." [*Marshall N. Dana Construction, Inc. v. United States,* 229 Ct.Cl. 862, 864 (1982), quoting from *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 712–713, 468 F.2d 922].

Plaintiff has not shown, nor can it be reasonably inferred, that the express or implied intention of any of the other parties to the agreements and contracts was to benefit *plaintiff.* Absent such showing or reasonable inference, plaintiff's claim of entitlement as a third-party beneficiary fails. *See H.F. Allen Orchards, et al. v. United States,* 4 Cl.Ct. 601 at 609 (Cl.Ct.1984) [MILLER, J.].

■ Plaintiff's final contention is that, due to the contracts executed and to HUD's supervision of the Harmony House project, an implied contract arose between plaintiff

and HUD. This court's jurisdiction over implied contracts has been held to extend only to contracts implied in fact, not to contracts implied in law.[10] Our predecessor court, the Court of Claims, explicated the test for determining the existence *vel non* of a contract implied in fact:

> It is fundamental that to constitute an implied contract upon which one may recover under the Tucker Act, there must be some consideration moving to the United States, or the Government must have received money under a duty to pay it over, or the claimant must have had a lawful right to the money when it was received.... Before a contract may be implied in fact, there must be a meeting of the minds which is inferred from the conduct of the parties, and in the light of the surrounding circumstances shows their tacit understanding. [*Somali Development Bank v. United States,* 205 Ct.Cl. 741, 750, 508 F.2d 817 (1974).]

In the instant case, plaintiff concedes that its construction contract was consummated with Union American, not with the United States. Nevertheless, plaintiff contends that because HUD supplied the conditions and specifications for the work to be done, mandated its approval before payments were disbursed, and assertedly guaranteed payment under a "guarantee" agreement, an implied-in-fact contract arose between plaintiff and HUD.

To buttress this argument, plaintiff points out that the administrative record reveals a high degree of involvement by HUD. This contention is undisputed. HUD's supervision of the project was pervasive, including the drafting of the contracts, inspection and approval of all drawings and construction, and the approval of all changes and payments made during construction. In short, HUD conceived, imple-mented and supervised the Harmony House project in every detail. Plaintiff therefore concludes that this court should disregard plaintiff's contract with Union American and find that a contract existed between it and HUD.

Plaintiff's theory, under the facts of this case, is not novel. Claims similar to the case at bar, where the federal government has subsidized state and local social welfare programs and where other contractors sought to recover damages from the United States, are legion.[11] Although it is incontestable that HUD supervised and controlled many aspects of the Harmony House project, it is well settled law that where the United States is not a *party* to a contract, "no express or implied contracts result between the United States and those who will ultimately perform the work." *Aetna Casualty, supra,* 228 Ct.Cl. at 152, 158 F.2d 1047. *See D.R. Smalley & Sons, Inc. v. United States,* 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967). This doctrine finds its seminal precepts as far back as *Jones v. United States,* 1 Ct.Cl. 383 (1865), and was manifestly enunciated in *D.R. Smalley, supra*—a case involving federal highway construction funds. In *Smalley,* the court explained:

> It is well established that the Federal Government is not liable for damages resulting from sovereign acts performed by it in its sovereign capacity. *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 345, 69 L.Ed. 736 (1925); *Jones v. United States,* 1 Ct.Cl. 383 (1865).

> The National Government makes many hundreds of grants each year to the various states, municipalities, to schools and colleges and to other public organizations and agencies for many kinds of public works, including roads and highways. It

---

**10.** The United States Supreme Court in *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925) stated: "The Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law."

**11.** *E.g., Somerville Technical Services v. United States,* 226 Ct.Cl. 291, 640 F.2d 1276 (1981); *H.A. Ekelin & Associates v. United States,* 225 Ct.Cl. 561, 650 F.2d 289 (1980); *Correlated Development Corp. v. United States,* 214 Ct.Cl. 106, 556 F.2d 515 (1977); *Housing Corporation of America v. United States,* 199 Ct.Cl. 705, 468 F.2d 922 (1972).

requires the projects to be completed in accordance with certain standards before the proceeds of the grant will be paid. Otherwise the will of Congress would be thwarted and the taxpayers' money would be wasted. *See Mahler v. United States,* 306 F.2d 713, 716–22 (3rd Cir. 1962), *cert. denied,* 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231. These grants are in reality gifts or gratuities. It would be farfetched indeed to impose liability on the Government for the acts or omissions of the parties who contract to build the projects, *simply because it requires the work to meet certain standards and upon approval thereof reimburses the public agency for a part of the costs.*

\* \* \* \* \* \*

The sovereign acts of the defendant described above do not impose liability on defendant for the acts and omissions of the State of Ohio on the theory of implied contract. The contracts were between the state and the plaintiff. [178 Ct.Cl. at 597–598, 372 F.2d 505] [Emphasis supplied.]

In *Aetna Casualty,* which applied the *Smalley* rationale to a case *very* analogous to the one at bar, the Court of Claims found no implied contract existed between the contractor and the United States. The plaintiffs, a construction company and its surety, had sued the United States for undisbursed mortgage proceeds held by the Government as assignee of the defaulted nonprofit public housing mortgagor. Not only had the contractor substantially completed the housing project and the various local housing authorities and HUD had already approved the project for occupancy, but the project owner had defaulted on the mortgage and sought protection under

Chapter 11 of the Bankruptcy Act of 1898, (formerly, 11 U.S.C. §§ 701 *et seq.*) HUD was assigned the mortgage and ultimately foreclosed on it. The Court of Claims concluded that although HUD was involved in all aspects of the project under § 236 of the National Housing Act (12 U.S.C. § 1715z–1), this involvement did not create either an express or implied contract between the contractor and the United States.

In the present case, plaintiff merely alleges that the United States has failed to pay the $70,000 allegedly owed by Union American under its contract with Union American, Inc. Assuming, *arguendo,* that this sum is due, plaintiff cannot recover from the United States without establishing a contractual relationship with the United States. *See G-Lam Corp. v. United States,* 227 Ct.Cl. 764 (1981). Plaintiff contends that since Associated-East elected to assign the mortgage to the United States, the United States became the "mortgagee" under 12 U.S.C. § 1713(a)(2),[12] and therefore acquired privity with Penn Towne. The critical inquiry, however, is "whether Congress intended the United States to be liable in the same manner a private successor mortgagee would be for undisbursed proceeds." *Aetna Casualty, supra,* 228 Ct.Cl. at 156, 158 F.2d 1047, an inquiry which the court in *Aetna Casualty* answered in the negative. Plaintiff has not cited a single case to support its third-party beneficiary theory. Moreover, legislative history[13] discloses no Congressional intent to create an obligation under these circumstances. *See Aetna Casualty,* 228 Ct.Cl. at 157, 158 F.2d 1047 (1981). Plaintiff's second contention must therefore also fail.

This court finds that, under the circumstances of this case, no implied contract

---

**12.** 12 U.S.C. § 1713(a)(2) provides:

"The term 'mortgagee' means the original lender under a mortgage, and its successors and assigns . . . ."

Although it is by no means certain that the definition of mortgagee in 12 U.S.C. § 1713(a)(2) applies to elections to assign under § 236 of the Act, §§ 1715z–1(j)(2)(C) states that § 1707(b) provides the relevant definition.

**13.** *See, e.g., Proposed Amendments to the National Housing Act, Hearings on H.R. 8520 Before the House Committee on Banking and Commerce,* 75th Cong., 2d Sess. 13 (1937) (testimony of Stewart McDonald, Federal Housing Administration); *Proposed Amendments to the National Housing Act, Hearings on S. 3055 Before the Senate Committee on Banking and Currency,* 75th Cong., 2d Sess. 16 (1937) (same).

between the plaintiff and the United States existed. HUD's acts in insuring the project vis-a-vis the mortgagor (including accepting default assignment) did not *ipso facto* create an implied contract between plaintiff and the United States, any more than did HUD's involvement in implementing its contract specifications and other relevant matters.

### Conclusion

Based on the foregoing analysis, this court holds that this court is without jurisdiction to grant plaintiff relief on its claims based on theories of federal common law or unjust enrichment. Furthermore, plaintiff has failed to demonstrate that it was the specifically intended beneficiary of any of the contracts or agreements among HUD, the lender, and the owner of the project. Plaintiff is therefore unable to claim any entitlement as a third-party beneficiary in this case. Finally, plaintiff has failed to show any facts demonstrating, under the relevant statutes and case law, the existence of an implied-in-fact contract with the United States.

In accordance with these findings, defendant's motion for summary judgment is GRANTED, and plaintiff's and intervenor's complaints are to be DISMISSED.